**Michael Edward SHONE**

v.

**STATE of Maine et al.**

Supreme Judicial Court of Maine.

Jan. 22, 1968.

Henry N. Berry III, Cape Elizabeth, for appellant.

John W. Benoit, Asst. Atty. Gen., Augusta, for appellees.

Before WEBBER, TAPLEY, MARDEN, DUFRESNE and WEATHERBEE, JJ.

DUFRESNE, Justice.

Michael Edward Shone, age 15, on May 15, 1967 by judgment of the Juvenile Court for the Ninth District, Division of Southern Division, was adjudged to have committed a juvenile offense by reason of his breaking, entering and committing larceny at the Blue Moon Cafe, Portland, Maine and was ordered committed to the Boys Training Center (Center) under 15 M.R. S.A. § 2611, subd. 4, par. B, for the term of his minority, unless sooner discharged by the superintendent. 15 M.R.S.A. § 2714. Transferred from the Center to the Reformatory for Men on or about May 28, 1967 under 15 M.R.S.A. § 2717 for incorrigibility, Shone sought relief from his alleged illegal imprisonment in post-conviction habeas corpus under 14 M.R.S.A. § 5502.

Petitioner contends that the permissive administrative transfer under 15 M.R. S.A. § 2717 without notice and hearing and without judicial approval was an invidious deprivation of his constitutional rights under both the State and Federal Constitutions. Constitution of Maine, Art. I, Section 6–A; Constitution of the United States, Amendment XIV, § 1. He claims specifically that the statute is unconstitu-

tional as being in violation of the due process clauses of both constitutions and of the equal protection clause of the fourteenth amendment to the United States Constitution. The single Justice below ruled favorably on the constitutionality of the transfer statute and dismissed the petition. Appealing to this Court, petitioner will receive no greater satisfaction as we also find no merit in his constitutional attack.

Initially, let us pause to insert the fact that this appeal does not raise for our consideration any issue of abuse of discretion on the part of the authorities in the administration of the transfer statute, such as insufficient factual reasons under the statute to justify the transfer order. Furthermore, petitioner concedes that, except for its alleged constitutional deficiency, his transfer from the Center to the Reformatory was statutorily proper.

The transfer statute, 15 M.R.S.A. § 2717, as can readily be observed, does not expressly provide either for notice and hearing at the hands of the administrative officials nor does it intimate even by implication any requirement of court approval. Certificate of incorrigibility and recommendation of the superintendent of the Center together with approval from the Commissioner of Mental Health and Corrections respecting the prospective transfer is all that is necessary. The statute in pertinent part reads as follows:

> "Any child committed to the center whose presence therein may be seriously detrimental to the well-being of the center, or who wilfully and persistently refuses to obey the rules and regulations of said center may be deemed incorrigible, and upon recommendation of the superintendent may be transferred to a reformatory with the approval of the Commissioner of Mental Health and Corrections, but no child shall be transferred under the age of 15. *To so transfer, the superintendent shall certify that the child is incorrigible upon the mittimus in the case with the recommendation that transfer to the appropriate reformatory be effected. Upon approval by the Commissioner of Mental Health and Corrections, the transfer may be effected* any time thereafter. It shall be the duty of the officers of the reformatory to receive any person so transferred and the remainder of the original commitment shall be executed at the reformatory, except that in the event a child so transferred has, in the opinion of the superintendent of the reformatory and of the superintendent of the center, benefited from the program at the reformatory, to such an extent that return to the center would be in the best interest of the child and of the community, such child may be returned to the center." (Emphasis supplied.)

In Green v. Robbins, 1962, 158 Me. 9, 176 A.2d 743, we viewed custodial transfer of inmates from the Reformatory to State Prison without further action of any court as within legislative competence, notice being taken that the original judgment and sentence were in no way changed or affected. Courts generally have held such administrative transfers within constitutional permissiveness, invading in no way any of the inmates' constitutional rights. Courts regard the possibility of transfer to the state penitentiary as an incident impliedly present in the reformatory sentence imposed by the court. The possibility of transfer must be read into, and becomes an integral part of, the reformatory sentence just as effectively as if set forth at length therein. The determination of the existing circumstances authorizing the transfer unless otherwise directed by the Legislature is properly delegated to institutional officers as an administrative duty and is no usurpation of judicial power. See, Stagway v. Riker, 1913, 84 N.J.Law 201, 86 A. 440; Glazier v. Reed, 1933, 116 Conn. 136, 163 A. 766; Uram v. Roach, 1934, 47 Wyo. 335, 37 P.2d 793, 95 A.L.R. 1448; Moffett v. Hudspeth, 1948, 165 Kan. 656, 198 P.2d 153; Tinsley v. Crespin, 1958, 137 Colo.

302, 324 P.2d 1033; Annotation, 95 A.L.R. 1455.

We do recognize that the instant transfer from the Boys Training Center to the Reformatory for Men is not on the same level as transfers from the Reformatory to the State Prison. The Center in the eyes of the Legislature was not meant to be considered as a penal institution. The State is directed to establish and maintain centers to *rehabilitate* boys between the ages of 11 and 17 committed thereto as juvenile offenders. 15 M.R.S.A. §§ 2712, 2714. The superintendent in constant residence at the center, § 2712, is given all the power which a guardian has over his ward and all the powers which parents have over their children *as to the person*, property, earnings *and rehabilitation* of every child committed to the center. Section 2712 provides that in order to accomplish such intended purpose of rehabilitation of juvenile offenders *there shall be employed* "the disciplines of education, casework, group work, psychology, psychiatry, medicine, nursing, vocational training and religion related to human relations and personality development." See, in contrast thereto, 34 M.R.S.A. § 1501, wherein the Reformatory is defined as a correctional institution and the State Prison as a penal institution.

In Wade v. Warden of State Prison, 1950, 145 Me. 120, 73 A.2d 128, our Court has detailed the benevolent purposes which the Legislature had in mind when it established the modern treatment to be given to juvenile offenders.

"He [the judge of a juvenile court] does not pass upon the crimes and misdemeanors of childhood wholly from the legal standpoint. The basic and primary idea of the legislature is salvation, not punishment. The nature of juvenile work is more philanthropic than the work of the common law jurist * * *. In the past the fundamental idea of the law has been punishment and not reformation, but modern legislation recognizes that the treatment of a child should be correctional and rehabilitative rather than punitive. The child of today is the adult citizen of tomorrow and should be removed from the influence of improper environments and directed into the paths of rectitude by preventative and corrective means, if the next generation is to live in a peaceful and law abiding community. The immature must be given the chance to become the good citizen, or if necessary be forced to give up an immoral or criminal life. It is the welfare of the child and the State, that the statute is aimed to protect, *by exercising a parental control*, without the scar of the so-called criminal record. Unfortunately, it will be necessary at times to inflict punishment on the vicious or depraved, and this the statute recognizes." (Emphasis supplied.)

Our transfer statute does recognize also that in certain circumstances sterner treatment and better security than are available in a training center for youthful offenders must replace the benevolent attitude initially displayed toward the juvenile delinquent. When a boy wilfully and persistently refuses to obey the rules and regulations of the center or if his continued presence therein may seriously impair its well-being, the whole purpose of the juvenile law would be in jeopardy and the legislative goal completely frustrated, if administrative authorities in charge had not the power to remove such recalcitrant or offensive inmate. The statute permits expulsion of those who insist upon the disruption of the institution's program of education and rehabilitation, not so much as a measure of punishment to the individual youth, but rather as a device for the protection of the juvenile center itself in the interest and general welfare of all those who submit willingly and obediently to its humanitarian curriculum.

As stated in Sheehan v. Superintendent of Concord Reformatory, 1926, 254 Mass. 342, 150 N.E. 231, "[I]t would frustrate this general humanitarian scheme for the

administration of the Industrial School for Boys if those not responsive to the reformative methods of the school must continue there in association with other boys yielding to its influences. Manifestly it would be within the power of the Legislature to provide for the segregation of such refractory inmates. There hardly could be question that in appropriate buildings more rigorous treatment and closer confinement might be provided for such inmates as a part of the regular course of the school. No substantial reason is perceived why such segregation may not be accomplished also by transfer to another state institution adapted to the needs of such inmates."

As mentioned in *Wade*, supra, the State in administratively transferring a juvenile from the Center to the Reformatory is exercising parental control over the youngster. It is under this doctrine of "parens patriae" that most authorities have adjudged similar statutes as our own transfer statute valid and constitutional against attacks such as raised herein that such legislation is a violation of the due process clauses of the state and federal constitutions and of the equal protection clause of the fourteenth amendment to the United States Constitution. Others have ruled transfers of unruly inmates from one institution to another to be an exercise of the State's police power. See Sheehan, supra; Long v. Langlois, 1961, 93 R.I. 23, 170 A. 2d 618; Harwood v. State, 1947, 184 Tenn. 515, 201 S.W.2d 672; Sonnenberg v. Markley, 1961, 7th Cir., 289 F.2d 126; Wilson v. Coughlin, 1966, Iowa, 147 N.W. 2d 175. Cf., In re Rich, 1966, 125 Vt. 373, 216 A.2d 266.

The petitioner decries his loss of certain substantial privileges to support his claim of deprivation of constitutional rights. True, at the Center a juvenile is not required to wear institutional garb; he is not under constant surveillance of guards; he is not confined within fenced or walled areas; he may leave the grounds to spend week-ends at private homes; he may attend a public high school in the vicinity or be allowed to take courses at the University of Maine; he may travel throughout the state as part of the Center's athletic program or choir group. All these liberties vanish with his transfer to the Reformatory. But they are withdrawn for all juveniles transferred because of incorrigibility and thus the procedure is not offensive to the constitutional requirement of equal protection. As stated in Duncan, Appl't v. Ulmer, 1963, 159 Me. 266 at 279, 191 A.2d 617, at 624, privileges extended an inmate of a State institution of necessity must be subordinated to the orderly administration of the institution, the presence of suitable facilities and other administrative considerations. These administrative concessions are within the discretion of the authority in charge and present no constitutional question.

While it is the decision of this Court that the plaintiff's direct attack upon the transfer statute must fail because such law merely sets up an administrative procedure to which the rules of constitutional due process are not applicable, nevertheless there are constitutional questions involved in the underlying initial juvenile proceedings which must be solved to assure the constitutionality of the transfer statute which depends upon them. Indeed, one's incarceration in the Reformatory by reason of transfer under 15 M.R.S.A. § 2717 would necessarily be tainted with illegality sufficient to support a post-conviction habeas corpus petition, if the required antecedent basic juvenile proceedings were void for invidious deprivation of constitutional safeguards of due process. True, the present petitioner has not shown that the application of the transfer statute as applied to him has resulted in the prejudice which he represents to be inherent in that law as an integral part of the juvenile law. He does concede that he had counsel representation at the juvenile court level and that he did not appeal from the court's decision that he had committed a juvenile offense with resulting commitment to the Center.

However, our Court has emphasized in Sleeper, Applt., 1952, 147 Me. 302, 87 A.2d 115, quoting from Bennett v. Davis, 1897, 90 Me. 102, at page 105, 37 A. 864, that "[I]t is not what has been done, or ordinarily would be done under a statute, but what might be done under it that determines whether it infringes upon the constitutional right of the citizen. The constitution guards against the chances of infringement."

Our transfer statute provides for the removal of the juvenile to the Reformatory whether or not the juvenile was given an opportunity to be heard in the original proceedings which initiated his trip to the reformatory institution made available for incorrigibles. Under those circumstances, with a view of obviating later consideration of the constitutionality of the transfer statute in such settings as where commitments to the Center might be made without the application of certain constitutional safeguards, and also with due regard to the recent decisions of the Supreme Court of the United States respecting the application of constitutional requirements to juvenile proceedings, we consider it our duty to examine our juvenile law with the transfer statute integrated therein in the light of the law of the land, especially as determined in the case of In the Matter of Gault, May 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527.

■ There, the Supreme Court of the United States has ruled that the Due Process Clause has a role to play in juvenile proceedings and that the parens patriae doctrine cannot justify state action or legislation completely excluding juveniles from the constitutional scheme. It viewed the problem as one of ascertaining the precise impact of the due process requirement upon such proceedings. Even though *Gault* does not reject the concept of noncriminality in Juvenile Court proceedings, it does hold that the constitutional privilege of due process is applicable thereto and must be observed. It specifically concludes that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parent must be given timely and adequate written notice of the specific charge or factual allegations to be considered at the hearing so that reasonable opportunity to prepare in defense may be had. It further holds equally essential for the determination of delinquency that the juvenile have the assistance of counsel and that the child and his parent must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child. Such constitutional strictures, we now hold, are applicable to our juvenile proceedings, and thus we need not rely on any presumption of constitutionality to support the validity of our transfer statute.

That the due process concept applies in cases of deprivations of liberty other than in criminal cases is not new to this Court. In Sleeper, Appellant, 1952, 147 Me. 302, 87 A.2d 115, we recognized that due process of law was applicable to proceedings for commitments to mental hospitals. See, also Opinion of the Justices, 1955, 151 Me. 24 at 35, 117 A.2d 57. Similarly, we applied similar standards for commitments of vagrants to workhouses. City of Portland v. City of Bangor, 1876, 65 Me. 120.

The benevolent purposes intended by our statute, 15 M.R.S.A. § 2501 et seq., to provide for our juvenile offenders that care, custody and discipline as nearly as possible approximating that which they should receive from their parents or guardians, and as far as practicable treatment commensurate with their status not as criminals but as young persons in need of aid, encouragement and guidance may still be obtained within the protective channels of due process. Such proceedings, we hold, remain civil in character, and the constitutional requirement of a jury trial, Constitution of Maine, Art. I, § 20, does not apply

to them. See, Ex parte Daedler, 1924, 194 Cal. 320, 228 P. 467; Wissenberg v. Bradley, 1930, 209 Iowa 813, 229 N.W. 205, 67 A.L.R. 1075; Annotation, 67 A.L.R. 1082; 31 Am.Jur. Juvenile Courts, § 67; 50 C.J. S. Juries § 80. But the due process directives as delineated in Gault, supra, are mandatory. Marsden v. Commonwealth, 1967, Mass., 227 N.E.2d 1. We need not at this time consider other constitutional issues raised and discussed in *Gault*. Our present treatment adequately disposes of the constitutional attack upon our transfer statute.

■ The petitioner concedes that he was deprived in no way of any of his constitutional rights in the juvenile court hearing which set the initial basis for his subsequent transfer from the Center to the Reformatory under administrative order, and therefore his appeal from the single Justice's ruling dismissing his petition for habeas corpus must be denied. The entry will be

Appeal denied.

WILLIAMSON, C. J., did not sit.