**Michael Edward SHONE, Petitioner, Appellant,**

v.

**STATE OF MAINE et al., Respondents, Appellees.**

**No. 7161.**

United States Court of Appeals First Circuit.

Jan. 31, 1969.

Henry N. Berry, III, Portland, Me., and Pierce B. Hasler, Gray, Me., for appellant.

John W. Benoit, Jr., Asst. Atty. Gen., with whom James S. Erwin, Atty. Gen., was on brief, for appellees.

Before ALDRICH, Chief Judge, STALEY* and COFFIN, Circuit Judges.

STALEY, Circuit Judge.

After exhausting state remedies, appellant, Michael Edward Shone, petitioned the district court for a writ of habeas corpus alleging that he was confined in the Men's Correctional Center, South Windham, Maine, (hereinafter "Correctional Center"), in violation of the due process and equal protection provisions of the 14th Amendment to the Federal Constitution. The district court found no such violation and dismissed the petition. Shone v. State of Maine, 286 F.Supp. 511 (D.C.Me., 1968). This appeal followed.

Appellant was adjudged a juvenile offender on May 15, 1967, by a Maine juvenile court and was ordered committed to the Boys Training Center (hereinafter "Training Center") pursuant to Me.Rev.Stat.Ann., tit. 15, sec. 2611(4) (B), for the term of his minority unless

* Of the Third Circuit, sitting by designation.

sooner discharged by the superintendent. Me.Rev.Stat.Ann., tit. 15, sec. 2714.[1] Shortly after his commitment to the Training Center, administrators of that institution deemed appellant incorrigible, and on or about May 28, 1967, he was transferred, at the age of fifteen, to the Men's Correctional Center[2] in accordance with Me.Rev.Stat.Ann., tit. 15, sec. 2717, which provided in pertinent part: [3]

"Any child committed to the center whose presence therein may be seriously detrimental to the well-being of the center, or who willfully and persistently refuses to obey the rules and regulations of said center may be deemed incorrigible, and upon recommendation of the superintendent may be transferred to a reformatory with the approval of the Commissioner of Mental Health and Corrections, but no child shall be transferred under the age of 15. To so transfer, the superintendent shall certify that the child is incorrigible upon the mittimus in the case with the recommendation that transfer to the appropriate reformatory be effected. Upon approval by the Commissioner of Mental Health and Corrections, the transfer may be effected any time thereafter. It shall be the duty of the officers of the reformatory to receive any person so transferred and the remainder of the original commitment shall be executed at the reformatory, except that in the event a child so transferred has, in the opinion of the superintendent of the reformatory and of the superintendent of the center, benefited from the pro-

1. Section 2714, as amended, (Supp.1967), provides in part:
   "A boy between the ages of 11 and 17 may be committed to the Boys Training Center * * *. All commitments of such children shall be for the term of their minority, unless sooner discharged by the superintendent * * *."
   The general purpose of establishing the Training Center is explicated in Me.Rev. Stat.Ann., tit. 15, sec. 2712, as amended, (Supp.1967), wherein it is declared:
   "The State shall establish and maintain training centers to rehabilitate children committed thereto as juvenile offenders by the courts of the State. Toward this end, the disciplines of education, casework, group work, psychology, psychiatry, medicine, nursing, vocational training and religion related to human relations and personality development shall be employed. * * *"

2. At the time of appellant's transfer, the Correctional Center was called the Men's Reformatory. Its name was changed shortly after the transfer by Me.Rev.Stat. Ann., tit. 34, sec. 801 (Supp.1967). This same statute also sets out the general purpose of the Correctional Center and specifies those that can be committed to it. It provides in part:
   "The Men's Correctional Center, formerly called the Reformatory for Men, located at South Windham, shall be maintained for the confinement and rehabilitation of:
   "1. *Males between 16 and 17 years of age.* Males over the age of 16 years and under the age of 17 years committed thereto after being adjudicated by the juvenile court to have committed juvenile offenses;
   "2. *Males over 15 years of age.* Males over the age of 15 years determined in accordance with Title 15, section 2717 to be incorrigible while under commitment to the Boys Training Center;
   "3. *Males over 17 years of age.* Males over the age of 17 years and under the age of 36 years who have been convicted of, or who have pleaded guilty to, crimes in the courts of the State, and who have been duly sentenced and committed thereto.
   "All of the males specified in subsections 1, 2 and 3 shall be detained and confined in accordance with the orders or sentences of the courts and rules and regulations of the center applicable to each such category. The provisions for the safekeeping or employment of such inmates shall be made for the purpose of teaching such inmates a useful trade or profession, and improving their mental and moral condition. * * *" Me.Rev.Stat.Ann., tit. 34, Sec. 801 (Supp.1967).

3. The transfer statute was repealed and replaced effective October 7, 1967, to reflect in part the change in names referred to in note 3, id. Other changes in the text of the statute have no material bearing on the disposition of this appeal. See Me.Rev.Stat.Ann., tit. 15, Sec. 2717 (Supp.1967).

gram at the reformatory, to such an extent that return to the center would be in the best interest of the child and of the community, such child may be returned to the center. * * * "

In Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), the Supreme Court decided that Baxstrom, a prisoner who had been placed in a mental hospital while serving his time, was denied equal protection of the laws by the operation of a New York statutory procedure whereby he was: (1) civilly committed to a mental institution at the expiration of his sentence without the jury review available to all others civilly committed; and (2) administratively transferred, in effect, from a civil mental hospital to a functionally distinct institution for the dangerously insane without the judicial determination that he was dangerously mentally ill such as that afforded to all others so committed, except those about to terminate a prison sen-

tence.[4] Appellant contends that under the Court's holding in *Baxstrom* he was denied equal protection of the laws because he was transferred to the functionally distinct Correctional Center pursuant to a statute that did not provide for a judicial hearing, while those youths who were not in the Training Center's custody were committed to the Correctional Center only after a statutorily mandated judicial hearing.[5] Similar arguments have proven persuasive in other recent cases.

In Bolton v. Harris, 395 F.2d 642 (D.C. Cir. 1968), petitioner, who had successfully pleaded not guilty to a crime by reason of insanity, argued that he was denied equal protection of the laws because he was committed to a mental institution without benefit of the protections afforded those civilly committed under the District of Columbia's Hospitalization of the Mentally Ill Act of 1964.[6] The court reasoned that since

4. Baxstrom was not actually physically transferred from one hospital to another. Following the expiration of his prison sentence he remained at Dannemora State Hospital, an institution for the dangerously insane under the control and jurisdiction of the New York Department of Correction. However, at the termination of his sentence he would have been placed in a civil mental hospital under the jurisdiction and control of the Department of Mental Hygiene had not officials of the latter department decided *ex parte* that he was too dangerous for a civil mental hospital. Conceptually, therefore, and at least on paper, Baxstrom was transferred from a civil mental hospital to a criminal-type hospital by an unreviewable decision of the Department of Mental Hygiene.

5. Juveniles not transferred from the Training Center are committed to the Correctional Center pursuant to Me.Rev.Stat. Ann., tit. 15, Sec. 2611(4) (A) (Supp. 1967), and Me.Rev.Stat.Ann., tit. 34, Sec. 801 (Supp.1967).

   As in *Baxstrom*, there is no question here that the Training Center and the Correctional Center differ sharply in the treatment and privileges accorded their respective occupants. In fact, it appears from our reading of the Maine Supreme Judicial Court's opinion in Shone v. State, 237 A.2d 412 (Me.1968), that the

Correctional Center is recognized as being functionally different from the Training Center. At page 415 the court stated:
   "We do recognize that the instant transfer from the Boys Training Center to the Reformatory for Men is *not on the same level as transfers from the Reformatory to the State Prison*. (Emphasis added.) The Center in the eyes of the Legislature was not meant to be considered as a penal institution. The State is directed to establish and maintain centers to *rehabilitate* boys between the ages of 11 and 17 committed thereto as juvenile offenders. * * * The superintendent * * * is given all the power which a guardian has over his ward and all the powers which parents have over their children *as to the person*, property, earnings *and rehabilitation* of every child committed to the center. (Emphasis in original.) * * * See, in contrast thereto, 34 M.R.S.A. § 1501, wherein the Reformatory is defined as a correctional institution and the State Prison as a penal institution."
   For further information regarding treatment and facilities afforded youths at the Training Center, see Note, Facts and Law of Inter-Institutional Transfer of Juveniles, 20 Me.L.Rev. 93 (1968) (hereinafter "Maine Law Review Note").

6. D.C.Code Sections 21-501 to 21-591.

*Baxstrom* decided that an individual's past criminal conduct, standing alone, did not give rise to a presumption of dangerousness which would justify substantially different commitment procedures and confinement conditions for the mentally ill, it was likewise impermissible to provide "radically different procedures for patients acquitted by reason of insanity and for civilly committed patients." [7] 395 F.2d at 650. Previously, the same court had held, relying upon *Baxstrom*, that it was unlawful to commit to a mental institution in a manner different from those committed under the Hospitalization of the Mentally Ill Act one who was involuntarily found not guilty by reason of insanity. Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F.2d 193 (1967).

And in People ex rel. Goldfinger v. Johnston, 53 Misc.2d 949, 280 N.Y.S.2d 304 (Sup.Ct. 1967), the New York Supreme Court was confronted with a factual situation strikingly analogous to that presented here. There, the petitioner was sentenced to an indeterminate term at a correctional school. He was eventually paroled, but was returned to the school as a parole violator. Five years later, he was administratively transferred to an institution for defective delinquents without receiving the notice and hearing granted under New York law to others adjudged dangerous mental defectives.[8] The court held that *Baxstrom* and Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), required issuance of the habeas corpus writ, but managed to preserve the constitutionality of the administra-tive transfer statute by reading into it, *inter alia*, provisions for notice and hearing.[9]

In *Specht*, supra, petitioner was convicted for indecent liberties under one Colorado statute, but sentenced to an indefinite sentence under another (the Colorado Sex Offenders Act). Petitioner argued that he had been denied due process because the trial court's critical new finding as to whether he constituted a threat of bodily harm to the public, or was an habitual offender and mentally ill, had been made without a hearing and on the basis of hearsay evidence to which he did not have access. The Court agreed, noting:

"The Sex Offenders Act does not make the commission of a specified crime the basis for sentencing. It makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a *new finding of fact * * * that was not an ingredient of the offense charged*. The punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm. * * *" 386 U.S. at 608–609, 87 S. Ct. at 1211. (Emphasis added.)

■ In the instant case, as in *Specht*, the fact (incorrigibility) that controlled appellant's ultimate fate (transfer to the Correctional Center) was no part of the original adjudication as to whether he was a juvenile offender.[10] Instead, he

---

7. Substantially the same result was reached by the New York Court of Appeals in a similar factual situation. People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966).

8. Mental Hygiene Law Sec. 135 (McKinney's Consol.Laws, c. 27).

9. The court read into the transfer statute, Correction Law Sec. 438 (McKinney's Consol.Laws, c. 43), all of the procedural safeguards provided in Sec. 135 of the Mental Hygiene Law.

10. There is still much to be learned in the area of behavioral science, but at least we have come far enough to know that one instance of breaking, entering, and committing larceny (appellant's offense) does not indicate that the offender will be unresponsive to enlightened and humane treatment.

What might be considered more reasonable presumptions than the one in issue here were struck down in *Baxstrom* and *Specht*. In *Baxstrom*, it was improperly presumed that one nearing the end of a prison sentence and who had proven crim-

was subjected to a new decision by a new decision-maker on the basis of conduct committed after his placement in the Training Center.[11] Standing alone, this new finding of incorrigibility may not have been violative of constitutional rights; but when solely on the basis thereof, and without benefit of those procedural safeguards enjoyed by young boys not transferred from the Training Center, appellant was committed to the concededly "functionally distinct" Correctional Center, he was denied due process and equal protection of the law.[12]

The Supreme Court in *Baxstrom* realized that petitioner therein might well require treatment in a criminal-type hospital, but stated that it was unconstitutionally arbitrary to allow state administrators to determine *ex parte* whether those nearing the end of a penal sentence were too dangerous for a civil hospital when the same issue was judicially determined for nonprisoners. Thus, where judicial procedures exist for determining the suitability issue for one class, a less fair process cannot be substituted merely because one is in the custodial care of the state. In the present case we do not dispute the possibility that appellant may be unsuited for the permissive milieu of the Training Center, or that his presence in the institution might be "seriously detrimental to the well-being of the center," Me.Rev.Stat.Ann., tit. 15, Sec. 2717, for he may indeed be incorrigible and require placement in the stricter environment of the Correctional Center; but we think it constitutionally impermissible for state officials to determine *ex parte* this issue as to him, when the same issue is judicially decided for all those not in the Training Center's custody. Under Maine's statutory scheme, a member of the latter class may be committed to the Correctional Center only after a judicial hearing and decision, Me.Rev.Stat.Ann., tit. 15, Sec. 2611(4) (A) (Supp.), which decision is subject to a full *de novo* judicial review, Me.Rev.Stat.Ann., tit. 15, Sections 2661(2) to 2666, with the further right to appeal to the Maine Supreme Court. Me.Rev.Stat.Ann., tit. 15, Sec. 2667. Benefit is also derived from the full measure of procedural safeguards enumerated in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *Baxstrom* and *Specht* require that substantially the same procedural protections be extended to a juvenile committed to the Training Center before he can be lawfully transferred to a functionally distinct institution on the basis of a critically new finding of fact.[13]

---

inal tendencies by virtue of past criminal conduct was too dangerous for a civil mental hospital. 383 U.S. at 114, 86 S. Ct. 760. In *Specht*, it was improperly presumed that one convicted of indecent liberties constituted a threat to the public. 386 U.S. at 607–608, 87 S.Ct. 1209. See Bolton v. Harris, 395 F.2d 642, 650, n. 45 (1968).

11. Those factors which are considered in determining the incorrigibility of a boy are discussed in the Maine Law Review Note at 106–110.

12. See note 5, supra. The district court also conceded the functional differences between the Training Center and Correctional Center. 286 F.Supp. at 515.

13. We think the necessity for counsel's presence at the transfer proceeding is just as compelling as the need for counsel at revocation of probation proceedings required by Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). Me.Rev.Stat.Ann., tit. 15, Sec. 2717 (Supp.1967), provides in part:

"* * * Upon recommendation of the superintendent of the correctional center and the superintendent of the center * * * a transferee who in the opinion of the [two superintendents] * * * has benefitted from the program at the correctional center, but is not ready for return to the community, and whose needs can then be best served by the program at the training center, may be returned thereto. * * *"

Obviously, when deciding whether an individual "has benefitted from the program at the correctional center," findings relative to his present behavior will necessarily be measured against the initial findings that caused his removal from the Training Center. Because of the part played by these initial findings in retransfer decisions, it will be beneficial to have

The state contends, *inter alia,* that *Baxstrom* does not apply to factual situations where there is no extension of sentence.[14] With this we cannot agree. It is our view that even if Baxstrom had been properly committed to a civil mental hospital following the expiration of his sentence, the Court would have nevertheless invalidated his transfer to a functionally distinct institution if it was based, as it was, on a proscribed presumption and an arbitrary classification.

■ It is next argued that the judgment of the district court should be affirmed because the transfer statute in question was enacted before appellant's committal to the Training Center, and therefore the committal must be held to have been pronounced subject to the provisions of the transfer statute.[15] This argument can be of no comfort to the state because we have already held that application of those very provisions denied appellant due process and equal protection of the laws. The more difficult question is whether we can read into the statute, as did the courts in Bolton v. Harris, supra, and People ex rel. Goldfinger v. Johnston, supra, those procedural protections that would save its con-

stitutionality. This we might be inclined to do were it not for the statement of the Supreme Judicial Court of Maine in Shone v. State, 237 A.2d 412, 414 (Me. 1968), that:

"The transfer statute, 15 M.R.S.A. § 2717, as can readily be observed, does not expressly provide either for notice and hearing at the hands of the administrative officials *nor does it intimate even by implication any requirement of court approval. * * *"* (Emphasis added.)

In view of the above statement so recently made by Maine's highest court, we think that proper regard for our Federal system precludes us from reading into the statute—even to prevent its demise—that which the Maine Supreme Judicial Court said was not impliedly there.

After carefully considering all the contentions advanced by the state, we have concluded that the district court erred in not granting the writ. Accordingly, the judgment of the district court will be vacated and the cause will be remanded to that court with instructions to grant the writ of habeas corpus returning appellant to the Training Center.

---

"the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case * * *." 389 U.S. at 135, 88 S.Ct. at 257.

14. This same contention appears to have been considered by the Court of Appeals for the District of Columbia in Cameron v. Mullen, 128 U.S.App.D.C. 235, 387 F. 2d 193, 201 (1967), wherein the court emphasized:

"* * * The Supreme Court struck down the New York system not because Baxstrom was reaching the end of his

sentence, but because it held dangerousness is not relevant to the *procedures* for determining whether a 'person is mentally ill *at all.'*" (Emphasis in original.)

15. Among those cases that have embraced this position are: Rich v. Chamberlain, 104 Mich. 436, 62 N.W. 584, 27 L.R.A. 573 (1895); State ex rel. Kelly v. Wolfer, 119 Minn. 368, 138 N.W. 315, 42 L. R.A.,N.S., 978 (1912); Petition of Cassidy, 13 R.I. 143 (1878); and Uram v. Roach, 47 Wyo. 335, 37 P.2d 793, 95 A. L.R. 1448 (1934).