FRANCIS H. SLEEPER, APPLT.

FROM DECREE OF THE JUDGE OF PROBATE

IN RE COMMITMENT OF RALPH S. SMALL TO

AUGUSTA STATE HOSPITAL

Cumberland.   Opinion, March 19, 1952.

*Alexander A. LaFleur, Attorney General,*
*Herbert H. Sawyer, Asst. Atty. Gen.,* for State of Maine.

*Arthur A. Peabody,* guardian *ad litem.*

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

MERRILL, J. On report from the Supreme Court of Probate for the County of Cumberland. One Ralph S. Small, alleged to be a person mentally ill, was committed to the Augusta State Hospital for observation and treatment under the provisions of Sections 104 and 105 of the Revised Statutes as enacted by Section 5 of Chapter 374 of the Public Laws of 1951. Within the time limited therefor by Section 105, the Superintendent of the Augusta State Hospital, Dr. Francis H. Sleeper, petitioned the Judge of the Probate Court in the County of Cumberland, from which county said Small had been admitted to the hospital, for Small's indefinite commitment to said hospital under the provisions of

Sections 106 and 107 of Chapter 23 of the Revised Statutes, as enacted by P. L., 1951, Chap. 374, Sec. 5. The Judge of Probate, to whom said petition was addressed, dismissed the petition on the ground that said Sections 104 to 107, inclusive, are unconstitutional "in that they authorize proceedings which are in violation of the due process clause of both the Constitution of the United States and of this State and that the Probate Court is without jurisdiction in the premises." From this decree of the Judge of Probate, Dr. Sleeper duly appealed to the Supreme Court of Probate for the County of Cumberland. Arthur Peabody, Esq., was duly appointed *guardian ad litem* for Ralph S. Small and appeared for him in the Supreme Court of Probate and also in this court. The case was reported by the Justice of the Supreme Court of Probate to the Law Court for hearing and decision upon an agreed statement of facts and certain testimony taken out in the Supreme Court of Probate.

Although the immediate question is whether new Sections 106 and 107 of Chapter 23 of the Revised Statutes as enacted as a part of P. L., 1951, Chap. 374, Sec. 5, are constitutional, the answer to this question in turn depends upon the constitutionality of new Sections 104 and 105. It is in new Sections 104 and 105 that the basic changes from the former provisions of the law relative to the involuntary commitment of the insane or mentally ill are to be found. Under the prior law, proceedings for the commitment of the insane to a public hospital could be instituted by a written complaint to the municipal officers of the town in which the person alleged to be insane was. Upon receipt of the complaint, it became the duty of the municipal officers to inquire into the condition of the one alleged to be insane and cause a true copy of the complaint to be given to him, together with notice of the time and place of the hearing and that he had a right and would be given an opportunity to be heard, all to be done at least 24 hours prior to the time set for hearing. It was required that the fact of the insanity of the person

in question be established at said hearing by the evidence of two reputable physicians, given under oath, together with their written certificate to that effect, based upon due inquiry and a personal examination of the person alleged to be insane. Upon being satisfied that such person was insane and that his comfort and safety or the safety of others interested would thereby be promoted, the municipal officers were to send him forthwith to one of the hospitals named in the act, directing the superintendent to receive and detain him until he be restored or discharged by law or by the superintendent or the department. R. S. (1944), Chap. 23, Secs. 105 and 107.

Section 106 of the original act, R. S., 1944, Chapter 23, provided that pending the issue of a certificate of commitment by the municipal officers, the superintendent of the hospital might receive into the hospital a person so alleged on complaint to be insane, provided he was accompanied by a copy of the complaint and physicians' certificate, which certificate must set forth that in the judgment of the physicians "the condition of said person is such that immediate restraint and detention is necessary for his comfort and safety or the safety of others." Said Section 106 further provided that unless within fifteen days thereafter the superintendent should be furnished with the certificate of commitment from the municipal officers the detention of such person should cease.

From these provisions of the statute it is seen that there was in every organized community in the state a board empowered to commit, that in all cases the person alleged to be insane was to be served with notice of the proceedings and given an opportunity to be heard on the question of his insanity and the necessity of his commitment to the mental hospital. Section 106 provided for the cases where immediate restraint was necessary pending determination by the municipal officers of the truth of the complaint. The emer-

gency commitment process was strictly ancillary to the main commitment proceeding which in no case could be determined without notice and an opportunity to be heard. The danger of abuse of the emergency process was minimized by the provision that unless a certificate of commitment was received by the superintendent within fifteen days the detention should cease.

This procedure was radically changed by the act of 1951. By new Section 104 enacted as a part of P. L., 1951, Sec. 5, it was provided that a petition for immediate admission and acceptance of an alleged mentally ill person into his institution for the purpose of observation and treatment could be addressed, not to a committing board, but to the superintendent of the public hospital to which admission was desired. Said petition was to be immediately presented to a city or town clerk, member of the city council or member of the board of selectmen in the town where the mentally ill person resided or was found. Such official was to immediately inquire into the facts set forth in the petition and if he was satisfied that the person required confinement and treatment in one of the state or federal hospitals, he was to so state on the petition and join in the same by affixing his signature thereto. The petition must be accompanied by a certificate signed by a physician stating therein that he had examined the person alleged to be mentally ill, together with his reason for his opinion that the person was mentally ill and required confinement and treatment in a hospital maintained for the mentally ill. Such examination must have been made within five days previous to the signing of the certificate. After signing the petition as aforesaid and the filing of the certificate by the physician, it was mandatory that the municipal official forthwith order the alleged mentally ill person to be taken to such state or federal hospital as he might properly designate, accompanied by a copy of the petition and the physician's certificate. Other provisions of the section are immaterial to the question here under discussion.

By new Section 105 which is enacted as a part of P. L., 1951, Chap. 374, Sec. 5, the following provisions are made:

> "Admission of patients; preliminary observation. The superintendent or head of the hospital to which the mentally ill person is sent, or his duly appointed substitute, shall receive and detain such person for observation and treatment for a period of not more than 35 days, provided that such person is accompanied by the petition and physician's certificate duly executed as set forth in section 104. Prior to the expiration of 25 days of the observation period the superintendent, head of the hospital, or his duly appointed substitute, or any justice of the peace or any notary public may certify, in a petition addressed to the probate court situated in the county from which said mentally ill person was admitted, that the alleged mentally ill person requires further care and treatment for an indefinite period."

New Sections 104 and 105 apply indiscriminately to all persons alleged to be mentally ill whether or not they actually require immediate hospitalization for their own safety or the safety of others, and whether or not they have sufficient mentality to appreciate the meaning of the notice of the proceedings if the same were served upon them. The new act makes no requirement for a certificate that the safety of the one alleged to be mentally ill or that of others requires his immediate commitment to the hospital. The new act makes no provision whatever for any hearing *ex parte* or otherwise before commitment for observation and treatment for the preliminary period of not more than thirty-five days. Under this act a person may be committed for observation and treatment for the preliminary period of not exceeding thirty-five days without hearing, without notice, without any opportunity to be heard and *without any provision being made in the act allowing him within said period to institute any proceedings to test the necessity of his commitment for observation and treatment.* The entire pro-

ceeding so far as he is concerned is *in invitum* and without opportunity to contest in advance or attack its validity thereafterwards during said period.

This court is fully aware that there are occasions which require the immediate taking into protective custody of one who is mentally ill because of the immediate danger that he will cause injury to himself or others. We are also fully aware that the best interests of the patient may in some cases demand immediate treatment pending the completion of proceedings for his ultimate commitment to a hospital for the mentally ill. R. S., 1944, Sections 105, 106 and 107 not only took care of all of these situations but also respected the constitutional rights of the one alleged to be insane. It is not that which actually is done under statutory authority but that which may be done under the statute that determines its constitutionality. As we said in *Bennett* v. *Davis*, 90 Me. 102, 105:

> "It is not what has been done, or ordinarily would be done under a statute, but what might be done under it that determines whether it infringes upon the constitutional right of the citizen. The constitution guards against the chances of infringement."

Under this statute as drawn (P. L., 1951, Chap. 374, Sec. 5), in the attempt to provide a single standardized procedure for both non-emergency and emergency commitments, it would be possible either by fraud or mistake to commit a perfectly sane person who is not in need of commitment, care or treatment, to a mental hospital and there hold him without any previous notice whatever and without his being afforded under the act any opportunity to be heard either in advance of or subsequent to his commitment and within said period of thirty-five days on the question of the necessity therefor.

We are not unmindful that courts have gone a great distance in sustaining the legality of commitments to mental

institutions especially where the act itself under which the commitment is made gives the party committed an unqualified right to obtain at any time a review of the present necessity of his detention and commitment. *In re Crosswell's Petition*, 28 R. I. 137, 66 Atl. 55; *Ex Parte Dagley*, 35 Okla. 180, 128 Pac. 699; *Payne* v. *Arkebauer*, 190 Ark. 614, 80 S. W. (2nd) 76.

Without in any way intimating our opinion of the soundness of the reasoning upon which such authorities are grounded, we would call attention to the fact that this act does not meet the test prescribed by those authorities. Notwithstanding the fact that new Section 124 enacted as a part of P. L., 1951, Chap. 374, Sec. 5, provides for inquiry into cases of unreasonable detention, it does not, as claimed by counsel for the appellant, in any way affect the present situation. In the first place, it is extremely doubtful whether or not it refers to or authorizes a petition in his own behalf to be instituted by the person committed to the hospital. Even if it does, a question upon which we need not intimate any opinion at this time, the section certainly does not apply to a person ordered into the hospital for preliminary observation and treatment. By its very terms it applies only to persons *"adjudged mentally ill and committed."* Under this statute there is no adjudication of mental illness prior to or during the preliminary period for observation and treatment. Counsel for the appellant argues that new Sections 104 and 105 apply to and can be used only in the emergency cases of those persons whose mental condition is such that their safety or the safety of others demands their immediate commitment for observation, care and treatment. As a reason for this construction the appellant urges that because new Sections 108 and 109 grant original jurisdiction to Judges of Probate to commit those mentally ill on hearing and after notice, and because Sections 104 and 105 do not require notice or hearing, and because commitments without notice and hearing can only be made in emergency

cases, it is the legislative intent that Sections 104 and 105 refer to and may be employed in emergency cases only.

The fallacy of this argument is shown by an examination of the law existing prior to the enactment of Chapter 374 of the Public Laws of 1951 and especially of those sections of the prior law which it purports to repeal. As we have heretofore shown, the original law authorized the municipal officers on petition to them, and after notice and hearing to commit in all cases emergent or otherwise. It also provided for temporary commitment in emergency cases pending such hearing. Along with these provisions for commitment by the municipal officers, the original law also conferred concurrent jurisdiction on Judges of Probate in the same manner that such jurisdiction is conferred on them by new Sections 108 and 109, enacted as a part of P. L., 1951, Chap. 374, Sec. 5. See R. S., 1944, Chap. 23, Secs. 111, 112.

New Sections 108 and 109 as enacted in P. L., 1951, Chap. 374, Sec. 5, are to all practical purposes re-enactments of Sections 111 and 112 in the old act. Sections 111 and 112 provided an alternate procedure applicable to all cases emergent or otherwise. Sections 105 and 107 in the original act applied to all cases to which Sections 111 and 112 applied. Section 106 of the original act furnished a method for the immediate commitment of those who needed immediate emergency confinement and with respect to whom proceedings under Section 105 were pending. New Sections 104 and 105 by their terms apply to any and all cases whether they be emergent or otherwise. The fact that new Sections 108 and 109 are but a re-enactment of old Sections 111 and 112 indicates that even as old Sections 111 and 112 did not limit the applicability of old Sections 105 and 107 to emergency cases, new Sections 108 and 109 do not limit the applicability of new Sections 104 and 105 and 106 to emergency cases. We hold that the application of new Sections 104 and 105 is not confined to emergency cases, but

that they in fact as well as in terms apply to all cases emergent and otherwise.

At common law an insane person who was a menace to his own safety or that of others could be confined in a suitable place by any interested person and that without legal process. *Porter* v. *Ritch et al.,* 70 Conn. 235; Bac. Abr., "Trespass" D, *573; 44 C. J. S. 160, Sec. 63 b; 32 C. J. 678, Sec. 342; 28 Am. Jur. 675, Sec. 31. This right to make such confinement without legal process was dependent upon the fact of actual insanity of such a nature that the person confined was actually a menace either to his own safety or that of others. *Porter* v. *Ritch, supra.* As said in that case:

> "An insane person whose going at large is dangerous to others, or to himself, and who is restrained, cannot maintain that he has been deprived of any right, or that he has suffered any injury. In most of the cases cited, the act placing a restriction upon the liberty of another was by a private person, and the act was held to be justified. But a private person can act only in an emergency, and then only at his peril: the peril of being unable to prove the existence of the emergency which is his justification. Restrictive conditions of this kind upon personal liberty, or upon the use of property, are sometimes absolutely necessary to the safety of all. A wise administration of government does not leave it to private persons to decide when these restrictions shall be exercised. Private persons may not be willing to take the hazard. And so statutes are passed which directly name or authorize a municipal board to appoint some one to judge of the emergency and direct the performance of those acts which any individual might do at his peril without any statute. Such an one is the agent of the law and incurs no personal liability."

The Connecticut statute which was under consideration in the case of *Porter* v. *Ritch* authorized the Judge of Probate before whom commitment proceedings were pending and of which notice had been given, to make a temporary

order for an emergency commitment pending the determination of the main issue. The constitutionality of the provision was sustained.

R. S., 1944, Chap. 23, Sec. 106, as before shown, provided for emergency temporary commitments pending final decision on the petition. The making of such statutory provisions was a proper exercise of the police power by the state. As before noted, such action was but ancillary to a pending proceeding which was to be heard in due course after notice and opportunity to be heard. It could be taken only in those cases where two physicians certified to the municipal officers that immediate restraint and detention was necessary for the comfort and safety of the person alleged to be insane or for the safety of others. Immediate detention without notice and an opportunity to be heard can only be justified when the immediacy of such action is required for the safety of either the person restrained or for the safety of others. As said in 28 Am. Jur. 676, Sec. 32:

> "The broad rule generally prevails that a valid proceeding to commit a person to an insane asylum or hospital requires, not only adequate notice to the alleged incompetent, but also an opportunity for him to be heard before the order of commitment is issued, unless there are circumstances, such as the condition of the alleged incompetent, which render notice and hearing impracticable, if not impossible."

We hold that this general rule applies to temporary commitments for observation and treatment which are not ancillary to a proceeding for final commitment, which proceeding for final commitment is only to be determined after notice to the person who is alleged to be mentally ill and affording him an opportunity to be heard.

New Sections 104 and 105 of R. S., Chap. 23, as enacted as a part of P. L., 1951, Chap. 374, Sec. 5, are not ancillary to a proceeding for final commitment to the hospital. The

proceeding for commitment for observation and treatment provided for in these sections is a preliminary proceeding, and the order of commitment is made to determine whether or not a petition for final commitment will be made.

Section 1 of the Fourteenth Amendment to the Constitution of the United States provides among other things that no person shall be deprived by any state "of life, liberty, or property, without due process of law;". The confinement of one who is mentally ill in a mental hospital is a deprivation of his liberty unless accomplished and continued with his voluntary consent.

New Sections 104 and 105 authorize *ex parte* involuntary commitment of a person alleged to be mentally ill to a hospital for observation and treatment for a period of thirty-five days. This may be done without affording him opportunity to be heard, without even an allegation, to say nothing of proof, that his mental condition is such that he is an immediate menace either to himself or to others, and with no opportunity afforded him by the statute to test during the continuance of his confinement either the validity or present necessity thereof. As tersely stated by Walton J. of another *ex parte* commitment in *Portland* v. *City of Bangor*, 65 Me. 120, 121, while it may not be easy to determine in advance what will in every case constitute due process of law, it needs no argument to prove that the *ex parte* commitment authorized by new Sections 104 and 105 is not such process. We therefore hold these sections enacted in P. L., 1951, Chap. 374, Sec. 5 unconstitutional and void.

In habeas corpus proceedings to obtain the release of an insane person the court not only inquires into the legality of the restraint but the necessity therefor, and if the person is found to be actually insane and a menace either to himself or to the safety of others, he is not entitled to discharge on habeas corpus. In *Re Oakes*, 1845, 8 Law Rep. 122; *Denny* v. *Tyler*, 3 Allen, 225; *Dowdell, Petitioner*, 169

Mass. 387. In other words, the welfare of the insane person and the safety of the public determines the result in habeas corpus rather than the strict legality of his restraint. This is similar to the law applied in cases of writs of habeas corpus to obtain the custody of children. It is the welfare of the child, not the strict legal right of the petitioner upon which ultimate judgment is founded. We call attention to this fact because it explains the result in some instances where habeas corpus proceedings were instituted to obtain the release of persons alleged to be illegally restrained and who were not released although it was found that the original commitment was illegal. However, the common law right to institute habeas corpus proceedings to test the validity of restraints is not the equivalent of requiring a legal order imposing restraint prior to commitment; nor does the fact that one may test the validity of his restraint by habeas corpus make an otherwise illegal restraint a legal one.

Having held new Sections 104 and 105 to be in violation of the due process clause of the constitution, we must next determine the effect of such unconstitutionality upon the rest of Section 5 of Chapter 374 of the Public Laws of 1951, which contains the new Sections 104 to 129, both inclusive, of Chapter 23 of the Revised Statutes.

Section 5 of said Chapter 374 provides: "Sections 104 to 143, inclusive, of chapter 23 of the revised statutes, as amended, *are hereby repealed and the following enacted in place thereof:*" (Emphasis ours.) It was the manifest and expressed purpose of the legislature by this section of Chapter 374 to repeal all of the sections specified and to substitute the new sections numbered 104 to 129, both inclusive, in place thereof. We believe that it was the manifest intent of the legislature to repeal the old sections only if the new sections took their place. Section 106 of Chapter 23 of the Revised Statutes of 1944, providing for emergency commitments was one of the essential features and provisions of the then existing statute.

Provision for placing a person who is mentally ill to the degree that he is dangerous to himself or others in immediate proper restraint is essential. Such timely restraint is essential not only to the immediate welfare of the person who is mentally ill and perhaps to his ultimate recovery but also to the safety of society. A comprehensive law providing for the commitment of the mentally ill to hospitals which fails to make provision for emergency commitment of the dangerous is woefully inadequate both from the legal, administrative and medical viewpoint. The only provision in the new act under which immediate restraint could be imposed upon the dangerous are new Sections 104 and 105. These sections we have hereinbefore declared unconstitutional because they are universal in their application, applying alike to all classes and degrees of mental illness and without distinction between persons who are dangerous and those who are not.

The authorities are not at all uniform on whether a *repealing clause*, which repeals numerous provisions of a statute, found in an act which enacts substitute provisions for those repealed, may be divisible and held effective in part and void in part, when one or more provisions of the substitute act are held to be unconstitutional. Upon this question we need not and do not express an opinion. We believe that the unconstitutionality of Sections 104 and 105 as enacted in Section 5 of Chapter 374 of the Public Laws of 1951 removes provisions of the act which are so basic and leaves the act so ineffective that without them the legislature would not have enacted any part of Section 5 of Chapter 374. It is our opinion that Section 5 is indivisible, that the unconstitutionality of Sections 104 and 105 is of such importance that neither the repealing act nor any of the substitute sections would have been enacted by the legislature had it realized the invalidity of new Sections 104 and 105. This being true, Section 5 of the Public Laws of 1951, Chapter 374, never became law and R. S., 1944, Chap. 23,

Secs. 104 to 143, both sections inclusive, have been and now are in full force and effect. This being true, the Judge of Probate had no jurisdiction to receive the petition of the appellant which he rejected.

It may be well to call attention at this time to the fact that Sections 132 and 133 and 134, of Chapter 23 of the Revised Statutes, which we now hold to be in effect and which were not re-enacted in Chapter 374 of the Public Laws of 1951, provide a procedure whereby the superintendents of the two state hospitals may validate any commitments which may have been made since the enactment of P. L., 1951, Chap. 374, and as to the legality of which they are in doubt.

*Appeal dismissed.*

*Decree of the Probate Court affirmed. Case to be remanded to the Probate Court for decree dismissing petition.*