## SALINGER *v.* SUPERINTENDENT, SPRING GROVE STATE HOSPITAL

[No. 115, October Term, 1954.]

624

*Decided March 28, 1955.*

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS and HAMMOND, JJ.

*John Brockenbrough Fox* for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *John C. Weiss, Assistant State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

In 1950 the jury found the appellant, Dolfi Salinger, insane at the time of the offenses and at the time of trial

in the Criminal Court of Baltimore, where he was being tried for various crimes of violence, including robbery with a deadly weapon. The court committed him to Spring Grove State Hospital as authorized by Code (1951), Art. 59, Sec. 7. At the trial, three of the four doctors who testified said that Salinger was not able to distinguish right from wrong or to understand the nature and significance of his acts—in other words, that he was insane under the McNaughten rule established as the Maryland law in *Spencer v. State,* 69 Md. 28, and referred to locally as the Spencer rule. This rule was reaffirmed in *Thomas v. State,* 206 Md. 575. In that opinion, the judicial criticism of the rule from the opinion of Judge Smith in *State v. Pike,* 49 N. H. 399, in 1869, to *Durham v. United States,* 214 F. 2d 862, and *Stewart v. United States,* 214 F. 2d 879, both decided in 1954, was recognized and discussed. Most psychiatrists disparage the rule. See *The Quest for a Test of Criminal Responsibility* by Dr. Manfred Guttmacher, The American Journal of Psychiatry, Vol. III, No. 6, December, 1954, and *The Doe-Ray Correspondence: A Pioneer Collaboration in the Jurisprudence of Mental Disease* by Dr. Louis E. Reik, 63 Yale Law Journal 183.

In 1954 Salinger filed a petition in Baltimore City Court, asking to have a jury pass upon his sanity, pursuant to Code (1951), Art. 59, Sec. 20, which provides that any person confined as insane shall be entitled to be brought into court "for the purpose of having the sanity of such person determined * * *. If the Court or jury, as the case may be, shall determine that such person is insane or is suffering from a mental disease, the Court shall order said person committed to the institution from which he immediately came or to some other suitable instiution; otherwise, he shall be discharged." At the hearing in the Baltimore City Court appellant was represented by counsel appointed by the Court. Five psychiatrists and the appellant testified. It is stipulated that the five doctors agreed in their testimony that Salinger knew the difference between right and wrong and

understood the nature and significance of his acts as applied to himself. They agreed that there had been no improvement in his condition since the time he was originally committed to Spring Grove Hospital. They said that if he was freed from the hospital, he would be a danger to himself and a menace to the person, safety and property of others. It was shown that Salinger was considered a problem patient and that the hospital staff was of the opinion that he was and would remain a dangerous psychopath. The hospital summary, which is in the record, showed that his behavior was habitually anti-social. On one occasion, he made a vicious attack on an attendant and escaped. His conversations at the hospital were colored by remarks such as—he must struggle with himself to keep from killing someone; he talked of escaping and killing two hundred people before being caught; of blowing up bridges. On another occasion, he stated: "I can commit murder or anything else and all they can do is send me back here."

At the conclusion of the trial, the court instructed the jury orally. He told them that they would be given one written issue to answer, namely: "Is the Petitioner, Dolfi Salinger, sane or insane at this date." He told the jury that if they found that the petitioner did not have the power or the ability to distinguish right from wrong or to understand the nature and significance of his acts, as applied to himself, they must find him insane; further, that if they found from the evidence that he could distinguish right from wrong and did understand the nature and significance of his acts, as applied to himself, to ask themselves this question: "If he becomes a free agent will he be a danger to himself, to his own safety, or will he be a menace to the safety of the person and or the property of other people? If you answer that question in the negative, having answered the first question positively, then you should find that he is sane." The jury were told by the court that if they answered the second question in the affirmative, they would have to find that the petitioner was insane.

The appellant asked the court to instruct the jury that they were not to believe that if petitioner were found sane he would be automatically freed from custody, since "the law provides that even then he cannot be released without the consent of the Criminal Court of Baltimore City sought in a separate proceeding." (Code (1951), Art. 59, Sec. 13.) The Court refused. The appellant asked further for specific instructions that the only test applicable in finding whether the petitioner was sane or insane was "whether he had the capacity and reasoning to distinguish between right and wrong and to understand the nature and significance of his acts as applied to himself." We are of the view that the court was right in making no reference to the provisions that the consent of the judge of the Criminal Court is required to release one confined as insane as a result of proceedings in the Criminal Court. The issue before the jury was sanity or insanity and not what would follow a finding of sanity. In so deciding, we are not to be considered as passing upon the constitutionality or effect of Code (1951), Art. 59, Sec. 13. We think, too, that the charge to the jury correctly set forth the controlling law and was not defective in form to the prejudice of the appellant.

Salinger's real reliance is that he was confined only and necessarily because a jury found that he did not know right from wrong; therefore, he must be released now that another jury has found that he does. He says there should be a single standard for incarceration and release. There are fallacies in the argument. One found to have been and to be insane in a criminal proceeding, is committed not because he did the act which caused him to be brought into court, but because it is not safe for him or the community for him to be at large. The confinement is not punishment, it is custodial. The acts which preceded it merely served to bring about a judicial determination in a particular form of the need for custodial confinement. This essential fact is not changed because, to avoid the consequences of his act, the accused, under Maryland law, must be suffering from a mental

illness or a disease of a kind and to a degree which brings him within the Spencer rule. Other kinds and degrees of mental illness and disease are, of course, well recognized by medicine and the law and some of them make the victim a menace to society and himself if he is at liberty.

Once a determination of insanity has been made in the Criminal Court, the status of the one insane is the same as if the determination had been made otherwise. In *Wagner v. Mayor & C. C. of Baltimore,* 134 Md. 305, 309, it was contended that an accused found insane was not subject to those provisions of Art. 59 of the Code that did not deal with insanity in relation to crime. The court flatly found to the contrary, holding that one found not guilty because insane: "* * * was thereafter to be treated simply as an insane person, just as he would have been treated under section 1 in the absence of any criminal charge against him. * * * It is true a different procedure was followed in reaching that conclusion, but when his insanity was established, his confinement thereafter was and must be regarded and treated in the same manner as if he had been confined under section 1 of said Article." The Code (1951), Art. 59, Sec. 42, reinforces this conclusion. This provides that any convict examined by the Department of Mental Hygiene and adjudged insane may be removed from the penal institution to some asylum within the State. If any such convict shall become sane before the expiration of his term, he shall be returned to the penal institution, and if he is still insane at the expiration of the term for which he was sentenced, "he shall remain in said asylum until in the opinion of said Department he shall have recovered his reason." Thus, if Salinger had been convicted of the crime for which he was tried and had become insane thereafter, the statute would have justified his retention until he could show that he had regained his reason.

The decisive question submitted to the jury—would the petitioner be dangerous to society if released—is the yardstick generally used to measure the right to confine or to keep confined one mentally ill. In 28 Am. Jur.,

Sec. 26, p. 672 (1954 Cum. Supp.), it is said: "Thus it has been generally recognized, both in the absence of an expressed statutory criterion and under statutes specifically so providing, that the general test or criterion of insanity or unsoundness of mind, warranting commitment to a mental hospital or asylum, depends upon whether such insanity is of such degree or character that, if the person so afflicted were allowed to be at large, he would by reason of such mental condition, be a danger to life, person, or property, or a menace to the public." At common law, an insance person who is a menace to himself or to others could be confined or restrained by any interested person without legal process. *Appeal of Sleeper* (Me.), 87 A. 2d 115; 10 A. L. R. 488; 45 A. L. R. 1464; and *Analysis of Legal and Medical Considerations in the Commitment of the Mentally Ill*, 56 Yale Law Journal, 1178, 1185. It is generally held that the States, in their character as *parens patria*, have both the general power and the duty to care for insane persons, and that in the exercise of the police power, insane persons may be restrained or confined both for the welfare of themselves and for the protection of the public, without violation of constitutional rights, provided the exactions of due process are met. *Wells v. Attorney General of the United States*, 201 F. 2d 556. Most jurisdictions have statutes authorizing the commitment and detention of the insane in institutions. Under the statutes, as generally interpreted, (whether explicit in this regard or not) the right to confine or keep confined an insane individual depends upon whether or not the person, if free, will probably imperil his own safety or the safety and property of others. *In Re Heukelekian* (N. J.), 94 A. 2d 501; *Appeal of Sleeper, supra; State, ex rel Wyman v. Turk* (Ohio), 23 N. E. 2d 644; *People ex rel Thaw v. Lamb*, 118 N. Y. S. 389; *State ex rel Sullivan v. Cocke* (Tenn.), 68 S. W. 2d 933; *Ex Parte Harcourt* (Calif.), 150 P. 1001; *State ex rel Thompson v. Snell* (Wash.), 89 P. 931; and cases collected in 158 A. L. R. 1220.

We hold that one who has been found not guilty of the charge of crime, because of due determination of insanity in a Criminal Court, has the same status as one confined as insane by virtue of some other procedure established by law and, in order to obtain release, must satisfy a judge or jury of his sanity, not only under the Spencer rule but under the tests generally applied as justifying confinement.  This being so, the basis of appellant's original commitment did not alone control the answer to the question of whether he should be released. It was pointed out in *Appeal of Sleeper* (Me.), 87 A. 2d 115, *supra,* where habeas corpus was brought to effect the release of one restrained as insane, that the matter to be decided was not only the legality of the original restraint but the necessity of continued confinement.  The Court held that even though the original confinement were illegal, if the petitioner was actually insane, he would not be released.  Similar rulings have drawn a distinction between the requirements of law in order to escape punishment for crime as insane and the general test of insanity in obtaining release, after detention has begun; see *State ex rel Wyman v. Turk, supra; People ex rel Thaw v. Lamb, supra; State ex rel Thompson v. Snell, supra;* and *State ex rel Sullivan v. Cocke, supra.*

The appellant says that even if the law be as we have found it to be, nevertheless the charge of the court was erroneous and prejudicial, because under its literal language , the jury could find any habitual criminal to be dangerous to himself and to society if at liberty, even though this danger was not the result of mental disease. In other words, he argues that when the court told the jury that if they answered in the affirmative the question "if he becomes a free agent, will he be a danger to himself, to his own safety, or will he be a menace to the safety or the person and or property of other people", they must find him insane, he was telling the jury it was at liberty to make a finding without relating it to mental disease.  We think that the language relied on by the appellant cannot be so isolated from its context.  The

jury were specifically told in a relatively short but comprehensive charge, what they, of course, already knew that the matter before them was to determine whether Salinger was sane or insane. The words "sane or insane" were repeated time and again in the charge, as were the words "mental disease", and the language relied on by the appellant came almost immeditely after these references and inescapably was tied to them. We think the jury could not have been misled, or have failed to realize that what it had to decide was whether the appellant would be a danger to himself or society because of his insanity or mental disease, if he were at large. It may be that the most satisfactory procedure in such cases would be to submit the single issue to the jury as to whether the petitioner is sane or insane and to instruct the jury that a person is insane, within the meaning of Code (1951), Art. 59, Sec. 20, if he either fails to meet the Spencer test, spelled out, or "by reason of mental disease he is a danger to himself, to his own safety, or a menace to the safety or the person and or the property of other people" if at large.

We think the charge in this case had, on the whole, the same effect as if the court had added as an immediate part of its instructions on the second point, the words "by reason of mental disease" and that there was no error in the trial below which hurt the appellant.

*Order affirmed, with costs.*