MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2021 ME 6
Docket:        Lin-20-117
Argued:        November 18, 2020
Decided:       January 28, 2021

Panel:         MEAD, GORMAN, HUMPHREY, HORTON, and CONNORS, JJ.

A.S.

v.

LINCOLNHEALTH

GORMAN, J.

[¶1]  On February 24, 2020, law enforcement officers brought A.S. to the LincolnHealth Miles Hospital Campus in Damariscotta, and he was held in the emergency department of that hospital for the next thirty days.  At no time during that period did LincolnHealth seek or obtain judicial endorsement of its detention of A.S., as required by 34-B M.R.S. § 3863 (2020).  On the eighteenth day of his detention, A.S. petitioned the Superior Court to issue a writ of habeas corpus for his release but, after a hearing, held on the twenty-fifth day of A.S.'s detention, the court (Lincoln County, *Billings, J.*) denied A.S.'s petition.  A.S. appeals from the judgment denying his habeas petition, contending that the court erred by concluding that LincolnHealth did not violate the statutory procedure for emergency involuntary hospitalization provided in 34-B M.R.S.

§ 3863.  A.S. also asserts that the court violated his due process rights by applying a standard of preponderance of the evidence to determine whether he posed a likelihood of serious harm.  We agree and vacate the judgment.

## I.  BACKGROUND

[¶2]  On March 13, 2020, A.S. filed a petition for a writ of habeas corpus in the Superior Court (Lincoln County), seeking to be released from the LincolnHealth emergency department.  *See* 34-B M.R.S. § 3804 (2020).  A hearing on that petition was scheduled to be heard by videoconference on March 20, 2020.  *See* 14 M.R.S. §§ 5521, 5523 (2020).  At the start of the hearing, the parties submitted the following set of stipulated facts, which the court adopted as its findings.  *See Fuller v. State*, 282 A.2d 848, 849 (Me. 1971).  Starting on February 24, 2020, LincolnHealth, which is not a psychiatric hospital within the meaning of 34-B M.R.S. § 3801(7-B) (2020), detained A.S. in its emergency department.  Although hospital staff had completed sixteen applications for emergency involuntary hospitalization since February 24, 2020, *see* 34-B M.R.S. § 3863(1)-(2), (3)(B), LincolnHealth did not file any of the involuntary hospitalization application forms with any court, *see* 34-B M.R.S. § 3863(3)(B)(2).  Throughout this period, despite exercising due diligence,

LincolnHealth could not find an appropriate placement in a psychiatric hospital for A.S.

[¶3] Before any evidence was presented, A.S. requested judgment on the stipulated record, arguing that LincolnHealth's restraint of him was unlawful and that the appropriate remedy was his release. The court (*Billings, J.*) denied A.S.'s request, explaining,

> [E]ven if I was in complete agreement with [A.S.'s] legal argument, I think the proper thing for the Court to do is to consider evidence from [LincolnHealth] in regards to whether or not is it appropriate, even if [A.S.] is correct legally—if it is appropriate when considering the equities for the Court to issue the extraordinary writ.

[¶4] A.S. objected to the hearing process, noting that the court was "about to have [an] involuntary commitment hearing without the protections that the statute provide[s]." The court overruled the objection and allowed LincolnHealth to present a series of witnesses. Among LincolnHealth's witnesses were its medical director, who explained the process that the hospital had used to find a psychiatric bed for A.S. and the actions that it took while it held A.S. in its emergency department; the vice president of medical affairs for Maine Behavioral Healthcare, who explained Maine Behavioral Healthcare's role in trying to find placements for psychiatric patients; and the

4

Maine Behavioral Healthcare program manager who had been working to find a placement for A.S. since his arrival at the hospital.

[¶5]  At the close of LincolnHealth's presentation, A.S. moved for judgment as a matter of law based on the uncontradicted evidence that, at no time during the days it held A.S. had LincolnHealth complied with 34-B M.R.S. § 3863(3) by obtaining judicial authorization for its actions.  In its response to that motion, LincolnHealth argued that it was not required to seek or obtain judicial authorization for its actions.  It explained,

> The hope here and the . . . full intentions of the hospital are to get [A.S.] a placement and to have that occur as soon as possible, *at which point due process protections of the involuntary hospitalization statute will kick into full effect*, where the hospital that accepts him would have to determine, I think within 72 hours, if he requires continued treatment, at which point a White paper application would be made and . . . he would have a protective custody hearing within, I think, a two-week period.
>
> *But . . . unfortunately . . . for [A.S.'s] protection and the protection of the community, he needs to be held in . . . custody until an appropriate hospital placement can be . . . identified.*

(Emphasis added.)  LincolnHealth acknowledged there was no "court authority" supporting its interpretation of section 3863 but told the court that this "practice . . . has been occurring for . . . for several years . . . without any licensing violations being issued by [the] Department of Health and Human Services or any other entity objecting to this practice."

[¶6]  Although noting that it was "quite striking that in this case, [A.S.] has been hospitalized . . . until this hearing . . . [with] no court proceeding," the court nonetheless denied A.S.'s motion for judgment as a matter of law.

[¶7]  At the conclusion of the hearing, after hearing testimony from A.S., the court denied A.S.'s habeas petition.  Without directly addressing section 3863's requirement that a hospital obtain judicial authorization for any emergency involuntary hospitalization, the court concluded that the section 3863 process "can be reset every 48 hours, based upon a new Blue Paper being completed based upon a new evaluation by a physician."  In addition, the court concluded that "the proper standard" for adjudicating a habeas petition pursuant to section 3804 "is whether as of now, an application for emergency involuntary admission to a psychiatric hospital could be granted, and basically whether the Blue Paper criteria could be met."  The court then found that "the Blue Paper standard could be met and has been met by the evidence."  The court did not explicitly state what evidentiary standard it applied in making that finding, but the record makes clear that the court rejected A.S.'s argument that a heightened standard should apply.  Instead, the court applied a standard different from the standard of clear and convincing evidence that would apply in an involuntary commitment hearing.  *See* 34-B M.R.S. § 3864(6)(A)(1)

6

(2020). The court also stated that it might have reached a different finding pursuant to the standard of clear and convincing evidence, stating that "the improvement that [the doctors] have noted in [A.S.] while he has been hospitalized might make that kind of finding difficult." A.S. timely appealed. *See* 14 M.R.S. § 1851 (2020); M.R. App. P. 2B(c)(1).

## II. DISCUSSION

A.     Mootness

[¶8]  The record in this case demonstrates that A.S. was discharged from LincolnHealth on March 25, 2020—after he spent a total of thirty days in LincolnHealth's emergency department—and is currently residing with a relative out of state.[1]  Because A.S. was discharged from LincolnHealth while this appeal was pending, there is no real or effective relief we can provide to him.  This absence of controversial vitality renders his appeal moot. *See In re Christopher H.*, 2011 ME 13, ¶ 11, 12 A.3d 64.  Generally, we decline to hear an appeal when the issues are moot, but, "we will address the merits where: (1) [s]ufficient collateral consequences will result from the determination of the questions presented so as to justify relief; (2) there exist 'questions of great

---

[1]  After A.S.'s appeal was docketed here, but before A.S. filed his brief, LincolnHealth moved to dismiss his appeal as moot.  We ordered that the motion to dismiss be considered with the merits.

public concern' that we address in order to provide future guidance; or (3) the issues are capable of repetition but evade review because of their fleeting or determinate nature." *Id.* (quotation marks omitted).

[¶9] The public interest exception and the repeat presentation exception to the mootness doctrine both apply here. When confronted with cases regarding involuntary emergency hospitalization or commitment, we have consistently determined the issues to be of great public concern and applied the public interest exception to the mootness doctrine.[2] *See, e.g., In re Marcia E.,* 2012 ME 139, ¶ 4 n.1, 58 A.3d 1115; *In re Christopher H.,* 2011 ME 13, ¶ 12, 12 A.3d 64; *In re Walter R.,* 2004 ME 77, ¶ 9, 850 A.2d 346. We find that the same interests support review in this case. In addition, because the process used by LincolnHealth is apparently used frequently by Maine's nonpsychiatric hospitals when those hospitals are forced to "board" psychiatric patients, we specifically determine that the hospitals and the courts dealing with those hospitals are in need of guidance in this area.[3]

---

[2] Title 34-B M.R.S. § 3863(9) (2020) provides, "Admission to a psychiatric hospital on an emergency basis under the provisions of this section is not commitment to a psychiatric hospital." We are mindful of the distinction, but also aware of the similarities.

[3] Psychiatric "boarding" has been defined as "the phenomenon of persons with mental disorders remaining in hospital emergency rooms while waiting for mental health services to become available." Lois A. Weithorn, *Envisioning Second-Order Change in America's Responses to Troubled and Troublesome Youth*, 33 Hofstra. L. Rev. 1305, 1369 (2005).

[¶10]  The exception to mootness for issues that present repeatedly has also been routinely applied to involuntary commitment proceedings "[b]ecause of the brief length of . . . commitment, and because it is likely that the specific issue[s] . . . will be repeatedly presented" yet evade review. *In re Christopher H.*, 2011 ME 13, ¶ 13, 12 A.3d 64 (quotation marks omitted).  The additional brevity of an involuntary emergency hospitalization—which is limited to no more than 120 hours—further supports the need for our review of the present case.  *See* 34-B M.R.S. § 3863.

B.     Standard of Review

[¶11]  As an initial matter, we must determine the standard of review applicable to our review of a trial court's adjudication of a "civil" habeas petition, i.e., a habeas petition that seeks release for a "nonprisoner" detainee. Title 14 M.R.S. § 5501 (2020) provides that "[e]very person unlawfully deprived of his personal liberty by the act of another . . . shall of right have a writ of habeas corpus," and 34-B M.R.S. § 3804 specifies that the writ is available to seek relief from involuntary emergency hospitalization.  *See In re Marcia E.*, 2012 ME 139, ¶ 8, 58 A.3d 1115 ("[The patient] could have challenged her detention [pursuant to section 3863] at any time by seeking a writ of habeas corpus.").

[¶12] The standards by which appellate courts in other jurisdictions review habeas decisions—criminal and civil—vary wildly, but most apply a standard of abuse of discretion to the ultimate disposition. *See, e.g., Ex parte Brown*, 591 S.W.3d 705, 707-08 (Tex. Crim. App. 2019) (stating that an appellate court generally reviews the denial of a habeas petition for an abuse of discretion but, when the facts are uncontested or the issue is purely legal, the review is de novo); *State ex rel. Hawley v. Thomson*, 538 S.W.3d 333, 334 (Mo. Ct. App. 2018) ("[W]e assess whether the habeas court exceeded its authority or abused its discretion in issuing the writ of habeas corpus." (quotation marks omitted)); *Hale v. State*, 992 N.E.2d 848, 852 (Ind. Ct. App. 2013) ("We review for an abuse of discretion . . . . [W]e consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom. Any conclusions regarding the meaning or construction of law are reviewed *de novo*." (citations omitted)); *Mathena v. Haines*, 633 S.E.2d 771, 775 (W. Va. 2006) ("We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review."); *Commonwealth v. Reese*, 774 A.2d 1255, 1261 (Pa. Super. Ct. 2001) ("When we

10

review a trial court's decision to grant or deny a petition for writ of *habeas corpus*, we will reverse only for a manifest abuse of discretion.").

[¶13] In criminal habeas cases, we have typically applied a de novo-like standard to the legal, constitutional, and statutory interpretation issues underlying a habeas decision. *See In re Holbrook*, 133 Me. 276, 276-77, 177 A. 418, 418-19 (1935); *Stern v. Chandler*, 153 Me. 62, 74, 134 A.2d 550, 556 (1957).

[¶14] After considering our criminal habeas precedents and the decisions of other jurisdictions on civil habeas petitions, we announce that we will apply the standard of abuse of discretion when reviewing decisions to grant or deny petitions for writs of habeas corpus requesting release of nonprisoner detainees. Here, therefore, we review the trial court's denial of A.S.'s habeas petition by reviewing its legal conclusions de novo, its factual findings for clear error, and its ultimate determination for abuse of discretion.

C.    Application of Section 3863

[¶15] At the crux of this appeal is a dispute regarding the interpretation of section 3863, which allows for involuntary emergency admission to a psychiatric hospital when there is a concern that an individual poses a likelihood of serious harm to himself or other persons because of a mental

illness.  We review de novo the interpretation of a statute.  *Strout v. Cent. Me. Med. Ctr.*, 2014 ME 77, ¶ 10, 94 A.3d 786.  "We look first to the plain language of the statute to determine its meaning if we can do so while avoiding absurd, illogical, or inconsistent results."  *Anctil v. Cassese*, 2020 ME 59, ¶ 6, 232 A.3d 245  (quotation marks omitted).  In doing so, "we must consider the entire statutory scheme in order to achieve a harmonious result."  *Id*. (quotation marks omitted).  Finally, "[o]nly if the meaning of a statute is not clear will we look beyond the words of the statute to examine other potential indicia of the Legislature's intent, such as the legislative history."  *State v. Conroy*, 2020 ME 22, ¶ 19, 225 A.3d 1011.

[¶16]  We begin by noting that section 3863 is an imprecise "fit" for what is actually happening in Maine's emergency departments as they struggle to deal with patients who need psychiatric beds at a time when the State has failed to create or fund enough of those beds.  Nonetheless, we must review the language of the statute, as it is the *only* statute that provides a hospital with any authority to hold a person who may be dangerous as a result of a mental illness.  Section 3863 is also one of a very limited number of statutes that provides the civil authority for a person or entity to hold another person against his wishes.[4]

---

[4]  Title 22 M.R.S. § 810 (2020) authorizes the Department of Health and Human Services to take emergency temporary custody of a person "in order to avoid a clear and immediate public health

12

Given the extraordinary action that this statute authorizes, we must keep in mind that the United States Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979).

[¶17] A.S. argues that LincolnHealth exceeded its authority to detain him pursuant to section 3863 in two ways: (1) by failing to submit any applications for involuntary admission for judicial review, and (2) by detaining him for longer than 120 hours, with or without such authorization. LincolnHealth, on the other hand, argues that its repeated completion of the first two steps in the blue paper process—the filling out of an application, *see* 34-B M.R.S. § 3863(1), and the obtaining of a certifying examination by a medical practitioner, *see* 34-B M.R.S. § 3863(2)—fulfilled the statutory requirements to hold an individual against his wishes. Specifically, LincolnHealth contends that section 3863 does not require the filing of an application for judicial review until after the admitting psychiatric hospital has been identified because the judicial officer cannot "endorse" the application, nor "promptly" send the application and

---

threat," but only after the Department obtains an order from a District Court judge or a Superior Court justice.

certificate to the admitting hospital, until it has been identified.[5]  34-B M.R.S.

§ 3863(3).

[¶18]  Section 3863 begins with the following language: "A person may

be admitted to a psychiatric hospital on an emergency basis according to the

following procedures."  It goes on to state that an emergency involuntary

hospitalization requires the completion of three steps: (1) a "health officer, law

enforcement officer or other person" must complete an application seeking the

emergency admission, (2) a medical practitioner must examine the individual

the applicant is seeking to admit and then complete and sign a certificate

supporting the application, and (3) a judicial officer must review and endorse

---

[5]  LincolnHealth contends that its interpretation of section 3863 is supported by the language found in the application for involuntary admission and the Department of Health and Human Services' instructions to Maine hospitals and providers.  In its amicus brief, the Department acknowledged the shortcomings of the current application form and indicated its intent to make revisions:

> [T]his form was last updated in 2014 and does not properly reflect the statutory requirements.  Given this fact, as well as the need for clarity amongst all parties involved in the emergency involuntary commitment process, the Department recognizes that this form should be updated. . . . Amendments to the form may include, for example, an option to indicate whether the hospital has identified an available bed for the detained individual for whom involuntary admission to a psychiatric hospital is being sought.  This would resolve the concern of having a judicial officer endorse the "Blue Paper" without being able to then "promptly send" the form to the admitting hospital. . . . Similarly, the form may include a representation by the hospital that it will notify the judicial officer as soon as an inpatient psychiatric hospital is identified.  Consistent with the Commissioner's discretionary authority, the form may also provide updated instructions in accordance with the current statutory requirements.

We note, however, that the statute's language—rather than forms created by the Department—direct and control the actions of the hospital.

14

the application and accompanying medical certification. *See* 34-B M.R.S. § 3863(1)-(3).

[¶19] The statute also establishes a very limited duration for which a person can be held for admission without the judicial endorsement required by section 3863(3). Section 3863(3)(B)(2) unambiguously states,

> A person may not be held against the person's will in a hospital under this section, except that a person for whom an examiner has executed the certificate under [section 3863(2)] may be detained in a hospital for a reasonable period of time, not to exceed 24 hours, pending endorsement by a judge or justice, if . . . the person or persons seeking the involuntary admission undertake to secure the endorsement immediately upon execution of the certificate by the examiner.

Eight years ago, in *In re Marcia E.*, we interpreted this language and held that "[u]nder no circumstances may a hospital hold a person against his or her will for longer than twenty-four hours unless the hospital has obtained a judge's endorsement." 2012 ME 139, ¶ 6 & n.3, 58 A.3d 1115 (citing 34-B M.R.S. § 3863(3)(B)(2) (2011)).

[¶20] Three years after we issued that decision, in response to concerns that, due to Maine's severe shortage of psychiatric beds, section 3863(3)(B)'s emergency twenty-four-hour hold provided insufficient time for a nonpsychiatric hospital to locate a psychiatric bed for a patient in crisis, paragraphs (D) and (E) of section 3863(3) were enacted. *See* P.L. 2015, ch. 309,

§ 3 (effective July 2, 2015) (codified at 34-B M.R.S. § 3863); *An Act to Improve Maine's Involuntary Commitment Processes: Hearing on L.D. 1145 Before the J. Standing Comm. on Judiciary*, 127th Legis. (2015) (testimony of the Maine Hospital Association). The enactment did not, however, alter the language of section 3863(3)(B)(2). *Compare* 34-B M.R.S. § 3863(3)(B)(2) (2011) (providing that "[f]or a person sought to be involuntarily admitted under this section, the person or persons seeking the involuntary admission undertake to secure the endorsement immediately upon execution of the certificate by the examiner"), *with* 34-B M.R.S. § 3863(3)(B)(2) (2020) (same).

[¶21] Because the 2015 amendments did not change the language of section 3863(3)(B)(2), hospitals seeking to hold or detain persons for placement into psychiatric hospitals must still obtain judicial authorization for their actions within the first twenty-four hours that the patient is detained. What was changed by the 2015 amendments, however, is the *duration* of the detention that such a judicial endorsement allows. The unambiguous language of the 2015 amendments permits a hospital that obtained judicial endorsement for a patient's detention during the "original" twenty-four-hour period of detention to continue to hold that individual for two additional forty-eight-hour periods if the hospital complies with certain requirements. *See* 34-B M.R.S.

§ 3863(3)(D)-(E). Section 3863(3)(D) grants hospitals the authority to hold the individual for a period lasting up to an additional 48 hours when

> **(1)** [t]he hospital has had an evaluation of the person conducted by an appropriately designated individual and that evaluation concludes that the person poses a likelihood of serious harm due to mental illness;
>
> **(2)** [t]he hospital, after undertaking its best efforts, has been unable to locate an available inpatient bed at a psychiatric hospital or other appropriate alternative; and
>
> **(3)** [t]he hospital has notified the department of the name of the person, the location of the person, the name of the appropriately designated individual who conducted the evaluation pursuant to subparagraph (1) and the time the person first presented to the hospital.

And, if that individual remains in the hospital for the entire forty-eight-hour period permitted by section 3863(3)(D), the individual may be held for an additional forty-eight-hour period if the hospital again satisfies the requirements of section 3863(3)(D), and "[t]he department provides its best efforts to find an inpatient bed at a psychiatric hospital or other appropriate alternative." 34-B M.R.S. § 3863(3)(E).

[¶22] As mentioned above, in explaining its decision not to seek any judicial endorsement of its medical determination that A.S. should be held, LincolnHealth asserted that, because it was unable to identify a psychiatric placement for A.S., it was unable to seek judicial approval. Although that

argument has some superficial appeal—what, exactly, would a judge be "endorsing" if not the placement of an individual into a particular psychiatric hospital—we must not lose sight of either the statutory language or the reason that the language exists. Section 3863 is found within Title 34-B, chapter 3, subchapter 4, article 3, which is entitled "Involuntary Hospitalization." Section 3863 and the other sections contained within article 3 authorize a hospital to do what it otherwise could not lawfully do—detain a person against his will. Section 3863 outlines the first step of that extraordinary process, a process that has the potential to deprive a person of his right to control where he is, what he does, and how he is treated. *See Guardianship of Hughes*, 1998 ME 186, ¶ 11, 715 A.2d 919 (explaining that involuntary commitment involves "a complete deprivation of a person's liberty to the extent the person could lawfully be restrained by force from leaving the facility" (emphasis omitted)); *Doe v. Graham*, 2009 ME 88, ¶ 23, 977 A.2d 391 ("We have previously recognized that both the private and governmental interests associated with involuntary commitment due to mental illness are substantial." (quotation marks omitted)).

[¶23] As LincolnHealth correctly explained during the hearing before the Superior Court, pursuant to the process created by section 3863, when a hospital *is* able to find a psychiatric placement for an individual, and a judge

endorses the application, the individual will be admitted to a psychiatric hospital against his wishes. If the admitting hospital believes that the individual needs "further hospitalization"—longer than three days—and is unable to convince the patient to stay, the admitting hospital must apply to the District Court to extend the hospitalization. *See* 34-B M.R.S. § 3863(5-A). The legal process and protections that flow from that application include the appointment of an attorney for the admitted person, a court-ordered evaluation by an independent medical practitioner, and the scheduling of a hearing. 34-B M.R.S. § 3864. If the admitting hospital fails to file an application within the prescribed deadline, "the person must be promptly discharged." 34-B M.R.S. § 3863(5-A)(C).

[¶24] As acknowledged by LincolnHealth, this process does "kick into full effect" at the time that an individual is admitted to a psychiatric hospital. LincolnHealth's argument that there is simply no due process for those held by but not admitted to hospitals, however, is not supported by the language of the statute or by our case law. In addition, we cannot accept the premise that, when it created two additional forty-eight-hour periods through sections 3863(3)(D) and (E), but did not change the language of section 3863(3)(B)(2), the Legislature intended to allow individuals to be held in emergency departments

for days or weeks without *any* legal process or safeguards. Thus, even if we were to find that section 3863, as amended in 2015, were somehow ambiguous, we could not endorse an interpretation of the statute that provides no legal protections for patients before an actual placement in a psychiatric hospital occurs.

[¶25] Our interpretation of the plain language of the statute, however, does not mean that LincolnHealth was required to either discharge A.S. or transfer him to a psychiatric hospital at the end of the first 120-hour period. If the patient cannot be safely released after the entire 120-hour authorized hold period has lapsed and if there is still no psychiatric bed available, the hospital may "restart" the process. *See* 34-B M.R.S. 3863(1)-(3). This restart requires that a new application and certifying examination, including adequate and updated information relevant to the individual at that moment in time, be submitted for judicial endorsement within twenty-four hours after the 120-hour period ends. With a new judicial endorsement in hand, the hospital may then continue its efforts to find an appropriate placement for the patient and will not be required to discharge him. There is nothing in the statute that prohibits this practice,[6] so long as the hospital immediately undertakes to

---

[6] Title 34-B M.R.S. § 3863 (2020) is silent on what happens at the end of the 120-hour period if no available psychiatric hospital has been identified, but if the Legislature intended that the hospital

secure judicial endorsement for every "new" statutorily authorized period of detention.

D.    Availability of Habeas Relief

[¶26]    LincolnHealth argues that, even if A.S.'s detention was unauthorized because the hospital did not comply with section 3863, the court acted appropriately in denying A.S.'s request for release based on its determination, by a preponderance of the evidence, that A.S. posed a likelihood of serious harm that justified his continued detention at the time of the hearing.

[¶27]  Pursuant to 14 M.R.S. § 5523, a court exercising habeas jurisdiction "may, in a summary way, examine the cause of imprisonment or restraint, hear evidence produced on either side, and if no legal cause is shown for such imprisonment or restraint, the court or justice shall discharge him," with one exception not relevant here.  We have stated, however, that "[i]n habeas corpus proceedings to obtain the release of [a mentally ill] person the court not only inquires into the legality of the restraint but the necessity therefor, and if the person is found to be actually [mentally ill] and a menace either to himself or to

---

must discharge that patient, it would have expressed that intention in that portion of the statute, just as it did in section 3863(5-A) (discharge required after the third day following admission to a psychiatric hospital on an emergency commitment if no timely application for continued commitment is made to the District Court).

the safety of others, he is not entitled to discharge on habeas corpus." *Appeal of Sleeper*, 147 Me. 302, 313, 87 A.2d 115, 121 (1952). "In other words, the welfare of the [mentally ill] person and the safety of the public determines the result in habeas corpus rather than the strict legality of his restraint." *Id.* at 314, 87 A.2d at 121.

[¶28] The rule that we explained in *Sleeper* is in line with our habeas corpus jurisprudence and its focus on an equitable and flexible approach, tailored to the circumstances surrounding the habeas petition. In *Sleeper*, we explained that release is not always required even if it is "found that the original commitment was illegal." *Id.*, 87 A.2d at 121. We also drew a parallel to cases involving a parent's habeas petition on behalf of a minor child, noting that "[i]t is the welfare of the child, not the strict legal right of the petitioner[,] upon which ultimate judgment is founded." *Id.*, 87 A.2d at 121.

[¶29] Here, the court appears to have applied a *Sleeper*-like standard—focusing on our guidance that the availability of habeas relief in this context does not turn solely on "the strict legality of [the] restraint." *Id.*, 87 A.2d at 121. The court, however, mistakenly used that guidance—and its concern that releasing A.S. would be contrary to his own health and possibly to the safety of himself and the community—to shape its interpretation of section 3863 and

the legality of A.S.'s detention.  In other words, the court first determined that A.S. posed a likelihood of serious harm, and based on its reluctance to order A.S. released, concluded that it should not grant A.S.'s petition.  Then the court applied its conclusion that A.S. should not be released to the predicate question of whether LincolnHealth had complied with section 3863.  The court should have focused first on the legality of LincolnHealth's hospitalization of A.S. and then considered its options for granting relief to A.S. from that unauthorized hospitalization.  *See id.* at 313-14, 87 A.2d at 121.

[¶30]  A court facing a similar situation in the future—having to balance an individual's liberty interests and his right to due process with concerns about his safety and the safety of the community—should understand that it has the ability to tailor any relief to effectively balance these competing interests.  For example, a court could tell the parties that it is granting the habeas petition but that it will stay for twenty-four hours the issuance of the mandate ordering release to allow the hospital to seek, through an application for involuntary admission, judicial endorsement of the patient's continued detention.

E.     Due Process and the Standard of Review for Involuntary Hospitalization

[¶31]  Finally, A.S. argues that the court violated his due process rights[7] when the court applied the standard of preponderance of the evidence, rather than clear and convincing evidence, to reach the determination that he posed a likelihood of serious harm to himself or others.  "We review de novo whether an individual was afforded procedural due process."  *In re Adden B.*, 2016 ME 113, ¶ 7, 144 A.3d 1158.[8]

[¶32]   Again we reiterate that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."  *Addington*, 441 U.S. at 425.  "Due process is a flexible concept that typically requires consideration of a number of factors, including the importance of the individual's interest, the potential for governmental error, and the magnitude of the state's interest."  *Mahaney v. State*, 610 A.2d 738, 742 (Me. 1992); *see also Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).  "The purpose of the assigned standard of proof is to instruct the factfinder

---

[7] No party has developed an argument that we should not interpret due process protections under the Maine and United States Constitutions co-extensively in this context.

[8] We also do not address the issue of whether the Superior Court has authority to involuntarily commit a patient, *see* 34-B M.R.S. § 3864 (2020) (discussing the District Court's authority with regard to involuntary commitments), because any Superior Court justice is authorized to sit as a District Court judge.  Authority of Judges/Justices to Sit in Either District or Superior Court, Me. Admin. Order JB-07-3 (effective Nov. 1, 2007).

concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. A greater degree of certainty is required when more serious consequences flow from a decision, and therefore a higher standard of proof is imposed." *Guardianship of Chamberlain*, 2015 ME 76, ¶ 20, 118 A.3d 229 (citation omitted) (quotation marks omitted).

[¶33] In *Addington*, the United States Supreme Court held that an "individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by" clear and convincing evidence. 441 U.S. at 427.

[¶34] As directed by *Addington* and our own statute, 34-B M.R.S. § 3864(6)(A), involuntary commitments may be ordered only if the court finds

> **(1)** [c]lear and convincing evidence that the person is mentally ill and that the person's recent actions and behavior demonstrate that the person's illness poses a likelihood of serious harm;
>
> **(1-A)** [t]hat adequate community resources for care and treatment of the person's mental illness are unavailable;
>
> **(2)** [t]hat inpatient hospitalization is the best available means for treatment of the patient; and
>
> **(3)** [t]hat it is satisfied with the individual treatment plan offered by the psychiatric hospital to which the applicant seeks the patient's involuntary commitment.

A.S. asserts that LincolnHealth's detention of him was in actual consequence an involuntary hospitalization. LincolnHealth's primary counterargument is that, because A.S.'s detention was based on a section 3863(1)-(3) emergency admission application, rather than one continued hospitalization controlled by section 3863(5-A) and section 3864, the court's only responsibility was to ensure that the emergency application was "regular and in accordance with the law" as that phrase is used in section 3863(3)(A).

[¶35]    The immediately identifiable problem with LincolnHealth's argument is the length of time it detained A.S.—twenty-five days at the time of the habeas hearing. Although a section 3863(3) judicial endorsement may authorize a hospital to detain an individual for up to 120 hours, A.S.'s detention far exceeded that limit, and even exceeded the duration of any commitment permissible without a hearing. *See* 34-B M.R.S. § 3864(5)(A). "The procedural safeguards associated with the involuntary commitment hearing process are commensurate with the substantial private and public interests at issue." *In re Kevin C.*, 2004 ME 76, ¶ 13, 850 A.2d 341. Given the length of time that A.S. had been detained, the fact that his detention was not initiated by a petition for involuntary *commitment* (as opposed to an involuntary *admission*) does not

26

change the severity of the deprivation or the private and public interests at issue.

[¶36] In determining whether this extended detention—despite its lack of any judicial authorization—should be permitted to continue, the court should have applied the standard of clear and convincing evidence. Therefore, we conclude that A.S.'s due process rights were violated when the court applied a standard of preponderance of the evidence, rather than clear and convincing evidence, to determine whether he posed a likelihood of serious harm at the time of the habeas hearing. *See Addington*, 441 U.S. at 425-27.[9]

## III. SUMMARY

[¶37] In summary, when a hospital determines that a person meets the requirements of section 3863(1) and it has a certificate from a medical practitioner that complies with section 3863(2), but there is no available psychiatric bed to which the person can be transferred, the hospital may detain the person for up to twenty-four hours *only* if it seeks to have the application for emergency hospitalization reviewed and approved by a judicial officer "immediately upon execution of [that] certificate." 34-B M.R.S. § 3863(3)(B)(2).

---

[9] We do not address whether A.S. also had the right to request that an independent medical practitioner examine him so that that independent assessment could be provided to the court. 34-B M.R.S. § 3864(4).

With that approval, the hospital may then hold the individual for up to an additional ninety-six hours—one forty-eight hour period authorized by section 3863(3)(D), and one forty-eight-hour period authorized by section 3863(3)(E)—without additional judicial review so long as the hospital (1) periodically determines—medically—that the person continues to pose a likelihood of serious harm, *see* 34-B M.R.S. § 3863(3)(D)(1); (2) undertakes its best efforts to locate an inpatient psychiatric bed, *see* 34-B M.R.S. § 3863(3)(D)(2); and (3) notifies the Department of any detention exceeding twenty-four hours, *see* 34-B M.R.S. § 3863(3)(D)(3).

[¶38] Because LincolnHealth did not obtain any judicial endorsement of its detention of A.S., that detention was unlawful, and the court erred when it determined that the detention was lawful. The court should have determined that the detention was not lawful pursuant to section 3863(3) and then determined what remedy was appropriate. Finally, because as of the time of the hearing the detention had already lasted twenty-five days, in determining the appropriate remedy and considering whether to release A.S., the court should have decided whether the hospital had established, by clear and convincing evidence, that A.S. needed further hospitalization.

The entry is:

Judgment vacated.

_____

Meegan J. Burbank, Esq. (orally), Berry & Burbank, Boothbay Harbor, for appellant A.S.

James P. Bailinson, Esq. (orally), and Michelle Bush, Esq., MaineHealth, Portland, for appellee LincolnHealth

Steven L. Johnson, Esq. (orally), and Taylor D. Fawns, Esq., Kozak & Gayer, P.A., Augusta, for amicus curiae Maine Hospital Association

Emma E. Bond, Esq. (orally), and Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, for amicus curiae American Civil Liberties Union of Maine Foundation

Aaron M. Frey, Attorney General, and Molly Moynihan, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for amicus curiae Department of Health and Human Services

Lincoln County Superior Court docket number CV-2020-10
FOR CLERK REFERENCE ONLY